555 P.2d 640

**In the Matter of Members of the State Bar of Arizona, John R. BATES and Van O'Steen, Respondents.**

**No. SB–96.**

Supreme Court of Arizona,
In Banc.

July 26, 1976.

Orme Lewis and John P. Frank, Phoenix, for State Bar of Arizona.

William C. Canby, Jr., Phoenix, for respondents.

CAMERON, Chief Justice.

This matter is before the court on objections to the conclusions of law and recommendations of the Board of Governors of the State Bar of Arizona which held that the respondents John R. Bates and Van O'Steen, attorneys at law, were guilty of violating the disciplinary rules for attorneys as provided in Rule 29(a) of the Rules of the Supreme Court, 17 A.R.S.

We must answer the following questions on review:

1. Does DR 2–101(B) violate either the federal or state antitrust laws?
2. Does DR 2–101(B) violate the First and Fourteenth Amendments of the United States Constitution?
3. Does DR 2–101(B) violate the Fourteenth Amendment right of equal protection of the law?
4. Is DR 2–101(B) void for vagueness?
5. Does the State Bar·Disciplinary procedure violate due process?

The facts of this case are not in dispute. John R. Bates and Van O'Steen are law partners engaged in the practice of law under the name of the "Legal Clinic of Bates and O'Steen." On 22 February 1976, respondents published an advertisement in the *Arizona Republic*, a newspaper of state-wide and substantial out-of-state circulation, publicizing the availability of their legal services and stating fees for certain services. See Exhibit A.

Disciplinary Rule 2–101(B) of Rule 29(a) of the Rules of the Supreme Court reads:

"A lawyer shall not publicize himself, or his partner, or associate, or any other lawyer affiliated with him or his firm, as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in the city or telephone directories or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf. * * *"

Respondents admit they knowingly violated DR 2–101(B).

After complaint, hearing, and findings by a Special Administrative Committee, the Board of Governors made the following findings of fact, conclusions of law, and recommendations:

"This matter having come on for full and final hearing on April 7, 1976, before the Special Administrative Committee of Ivan Robinette, Carl W. Divelbiss,

and Philip E. vonAmmon, Chairman, and the matter having been heard, evidence having been taken, and briefs having been submitted, and the Board of Governors having reviewed the above matter on April 28, 1976, it is now determined and recommended by the Board as follows:

## FINDINGS OF FACT

"The Respondents, John R. Bates and Van O'Steen, did, in fact cause an advertisement for their law office to be published in a Phoenix newspaper, as charged in the Formal Complaint and as admitted in the Answer.

## CONCLUSIONS OF LAW

"The act of the Respondents violates Disciplinary Rule 2–101(B).

## RECOMMENDATIONS

"The act of the Respondents was on one hand a deliberate and knowing violation of the Rule, but on the other hand was undertaken as an earnest challenge to the validity of a rule they conscientiously believe to be invalid. We therefore recommend a penalty of one-week suspension from the practice of law for each of them, the weeks to run consecutively and not simultaneously, so as to avoid the closing down of their practice. "We further recommend that the enforcement of this discipline be suspended until 30 days after a final decision has been made concerning the validity of the rule in the highest court to which it is presented.

"The foregoing Findings of Fact, Conclusions of Law, and Recommendations are issued by the Board of Governors this 30th day of April, 1976, pursuant to Rule 36(d) of the Rules of the Supreme Court of the State of Arizona.

/s/ Mark I. Harrison

Mark I. Harrison, President
State Bar of Arizona       "

Respondents timely objected to the recommendations of the Board of Governors

and the matter was transferred to this court pursuant to Rule 36(d) of the Rules of the Supreme Court.

## ANTITRUST LAWS

■ Respondents contend that DR 2–101 violates Sections 1 and 2 of the Sherman Act. 15 U.S.C. § 1, 2 and Arizona antitrust statutes A.R.S. §§ 44–1401 through 44–1413. That a rule is a violation of the federal or state antitrust laws is a defense when the court is being asked to enforce a violation of these rules, *Continental Wallpaper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909); *Sola Electric Co. v. Jefferson Electric Co.*, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed.2d 165 (1942), and this defense is available in the state court. *General Aniline & Film Corp. v. Bayer*, 305 N.Y. 479, 113 N.E.2d 844 (1953).

In support of their position, respondents rely heavily on *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed. 2d 572 (1975). In *Goldfarb*, supra, the Supreme Court held that a county bar's publication of a minimum fee schedule, and enforcement of this schedule through professional discipline by the state bar, was anticompetitive activity which the Sherman Act was clearly meant to proscribe.

We do not believe that the holding of *Goldfarb*, supra, applies to the facts of this case. *Goldfarb*, supra, was concerned with a minimum fee schedule. Attempts at minimum fees or price floors are traditionally the target of antitrust laws, state and federal, as they tend to artificially raise the prices of goods and services without a corresponding increase in the value of those services. The control of advertising by the Supreme Court of members of the Bar is far different than price fixing by a local bar association. We do not believe that Disciplinary Rule 2–101(B) conflicts with *Goldfarb*, supra.

However, even if we were to find that DR 2–101(B) violated the provisions of the Sherman Act, we believe this would be state action which is exempt by the Sherman Act. The Sherman Act was not

meant to restrain activities required by the state acting as a sovereign. The Supreme Court stated:

" * * * [I]n view of the [Act's] words and history, it must be taken to be a prohibition of individual and not state action. * * * The state * * * imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit. * * * " *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315, 326 (1943).

This position was reinforced by the United States Supreme Court in *Goldfarb,* supra, as follows:

"The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as a sovereign. (citations omitted) Here we need not inquire further into the state action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent. Respondents have pointed to no Virginia statute requiring their activities; state law simply does not refer to fees, leaving regulation of the profession to the Virginia Supreme Court; although the Supreme Court's ethical codes mention advisory fee schedules they do not direct either respondent to supply them, or require the type of price floor which arose from respondents' activities. * * * " 95 S.Ct. at 2015.

The regulation of the State Bar by the Supreme Court is an activity of the State of Arizona acting as sovereign and exempt by the very provisions of the Sherman Act. *Parker v. Brown,* supra; *State of New Mexico v. American Petrofina, Inc.,* 501 F.2d 363 (9th Cir. 1974).

■ There is, however, another reason why the respondents reliance upon the antitrust provision of the state and federal acts is misplaced, over and above the exemption contained in the Sherman Act.

The State Bar of Arizona is an integrated bar, integrated by court rule. Rule 27, Rules of the Supreme Court, 17A A.R.S. Attorneys are officers of the Supreme Court and subject to the regulation of that court, and the legislative branch of government, state or federal, may not interfere with the court in the reasonable and constitutional regulation of the practice of the law. This seems to have been recognized by the Supreme Court in *Goldfarb,* supra, when it stated:

" * * * The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' (citations omitted) In holding that certain anti-competitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions." *Goldfarb v. Virginia State Bar,* supra, 421 U.S. at 792, 95 S.Ct. at 2016, 44 L.Ed.2d at 588.

## FIRST AMENDMENT

■ Respondents urge that DR 2-101(B) should be declared null and void as a violation of the First Amendment. *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). We disagree. Restrictions on professional activity, and in particular advertising, have repeatedly survived constitutional challenge. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Barsky v. Board of Regents,* 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954); *Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935). The legal profession, like the medical profession, has always prohibited advertising since it is a form of solicitation deemed contrary to the best interests of society. *In re Cohen,* 261 Mass. 484, 159 N.E. 495 (1928); *State ex*

*rel. Hunter v. Crocker*, 132 Neb. 214, 271 N.W. 444 (1937); *Mayer v. State Bar of California*, 2 Cal.2d 71, 39 P.2d 206 (1934).

In the case of *Bigelow v. Virginia*, supra, a newspaper editor was convicted of running an ad offensive to a Virginia statute concerning abortions. In the instant case, we are not concerned with the prosecution of the newspaper for running the ad in question. Were this the case, we would have no hesitancy in invoking the First Amendment in the newspaper's favor. In the instant case, we are concerned with the regulation of the attorneys for violating the rule against advertising by an attorney. That *Bigelow*, supra, does not apply is indicated in the footnote which states:

> "Our decision also is in no way inconsistent with our holdings in the Fourteenth Amendment cases that concern the regulation of professional activity." *Bigelow v. Virginia*, 421 U.S. at 825, 95 S.Ct. at 2234, 44 L.Ed.2d at 614.

The recent case of *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, supra, relied upon by the respondents can also be distinguished. *Virginia Board of Pharmacy*, supra, concerned the power of the state to prohibit the advertising of prepackaged prescription drugs. Mr. Chief Justice Burger in his concurring opinion stated:

> "Our decision today, therefore, deals largely with the State's power to prohibit pharmacists from advertising the retail price of prepackaged drugs. As the Court notes, *ante*, at 1831 n. 25, quite different factors would govern were we faced with a law regulating or even prohibiting advertising by the traditional learned professions of medicine or law.
>
> " 'The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." ' *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct.

2004, 44 L.Ed.2d 572 (1975). See also *Cohen v. Hurley*, 366 U.S. 117, 123–124, 81 S.Ct. 954, 958–959, 6 L.Ed.2d 156, 161–162 (1961). * * *

> " * * * I think it important to note also that the advertisement of professional services carries with it quite different risks than the advertisement of standard products. The Court took note of this in *Semler*, 294 U.S. at 612, 55 S. Ct. [570], at 572, 79 L.Ed. at 1090, in upholding a state statute prohibiting entirely certain types of advertisement by dentists:
>
>> 'The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous.'
>
> "I doubt that we know enough about evaluating the quality of medical and legal services to know which claims of superiority are 'misleading' and which are justifiable. Nor am I sure that even advertising the price of certain professional services is not inherently misleading, since what the professional must do will very greatly in individual cases. It is important to note that the Court wisely leaves these issues to another day." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, supra, 425 U.S. at 774, 96 S.Ct. at 1831, 48 L.Ed.2d at 365.

And footnote 25 in the major opinion stated:

> "We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, supra, 425 U.S. at 773, 96 S.Ct. at 1831, 48 L.Ed.2d at 365.

We find no First Amendment violation.

## EQUAL PROTECTION

■ Respondents contend that since advertising is permitted by qualified legal assistance organizations, they are being denied equal protection of the law by not being allowed to advertise. Respondents, in their brief, state:

> " * * * No such compelling state interest has been shown why advertising by private attorneys must be totally banned while some advertising of qualified groups is permitted, and while attorneys engaged in political or organizational activities may publicize themselves as attorneys. The total ban of advertising by attorneys in relation to their private practice therefore violates the equal protection clause of the Fourteenth Amendment."

We disagree. DR 2–101(B) further reads as follows:

> " * * * However, a lawyer recommended by, paid by, or whose legal services are furnished by, a qualified legal assistance organization may authorize or permit or assist such organization to use means of dignified commercial publicity, which does not identify any lawyer by name, to describe the availability or nature of its legal services or legal service benefits. This rule does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name:
> "(1) In political advertisements when his professional status is germane to the political campaign or to a political issue.
> "(2) In public notices when the name and profession of a lawyer are required or authorized by law or are reasonably pertinent for a purpose other than the attraction of potential clients.
> "(3) In routine reports and announcements of a bona fide business, civic, professional, or political organization in which he serves as a director or officer.
> "(4) In and on legal documents prepared by him.
> "(5) In and on legal textbooks, treatises, and other legal publications, and in dignified advertisements thereof.
> "(6) In communications by a qualified legal assistance organization, along with the biographical information permitted under DR 2–102(A)(6), directed to a member or beneficiary of such organization."

We believe that these classifications are reasonable. For example, the purpose of allowing legal assistance organizations a limited amount of advertising is to bring to the attention of those of limited finances who are in need of legal assistance but who are frequently unaware of the fact that such services are available. The attorney himself may not advertise but only the legal assistance organization.

We do not believe that DR 2–101(B) violates the equal protection provisions of the United States Constitution or the Arizona Constitution.

## VAGUENESS

■ Respondents further contend that they are being denied due process because Rule DR 2–101(B) is void for vagueness.

Respondents contend that a rule must be sufficiently definite that a person of ordinary intelligence may understand whether his contemplated conduct is prohibited. Of course, in the instant case, there is no indication that the respondents did not know the advertisement violated DR 2–101(B).

We do not find the rule vague or over-broad and persons of ordinary intelligence, be they attorney or non-attorney, should have no difficulty in reading this rule as prohibiting a lawyer from publicizing himself "through newspaper or magazine advertisements." DR 2–101(B).

## DUE PROCESS

■ Respondents contend that Rules 26 through 33 of this court violate due process because the members of the Special Administrative Committee and the Board of Governors were in competition with the respondents. Respondents cite the United States Supreme Court:

> "It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). And *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey.* It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest applies with equal force to * * * administrative adjudicators.' * * * " *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488, 500 (1973).

Admittedly, there is a question when members of a profession attempt to self-regulate their profession and impose discipline for violations of what may be at times technical and complex standards. While there is a necessity for fair and impartial hearings, there is also the necessity that the persons who must hear the allegations of professional misconduct have the required knowledge of the standards and needs of the profession. Non-professionals alone could not bring to the hearings a sufficient knowledge and understanding of professional standards or a compulsion to enforce them. The most the non-professional would bring to such a hearing is business ethics, and business ethics, while adequate for the commercial world, are not sufficient as a standard for professional conduct. We must then balance the need for an informed and concerned Board with the degree of pecuniary interest, however slight or minimal, which may exist when attorneys sit in judgment of other attorneys. In the instant case, we do not find a sufficient pecuniary interest by the Committee or the Board to require that they be disqualified because of interest.

Even if we were to find that the Board and Committee had a sufficient pecuniary interest to make them suspect, there is a safeguard in that the final arbiter in disciplinary matters is the Supreme Court which has the obligation to make an independent determination of the facts from the record. *In re Johnson,* 106 Ariz. 73, 471 P.2d 269 (1970); *In re Lurie,* 113 Ariz. 95, 546 P.2d 1126 (1976). There is no pecuniary conflict between the members of this court and the respondents and we find no lack of due process.

## DISPOSITION

■ The Board of Governors recommended that since the act of placing the advertisement in the *Arizona Republic* was done in good faith as an earnest challenge to the validity of DR 2–101(B), respondents should only be suspended from the practice of the law for one week each, the weeks to run consecutively. We agree with the Board of Governors that the act was done in good faith to test the constitutionality of DR 2–101(B). We believe that the respondents should be censured only.

It is ordered that upon issuance of the mandate herein, the respondents John R. Bates and Van O'Steen are guilty of the violation of DR 2–101(B), Rule 29(a), 17 A.R.S., and that they and each of them are censured.

STRUCKMEYER, V. C. J., concurs.

EXHIBIT A

*ARIZONA REPUBLIC*

February 22, 1976

ADVERTISEMENT

# DO YOU NEED A LAWYER?

## LEGAL SERVICES AT VERY REASONABLE FEES

* Divorce or legal separation--uncontested [both spouses sign papers]

 $175.00 plus $20.00 court filing fee

* Preparation of all court papers and instructions on how to do your own simple uncontested divorce.

 $100.00

* Adoption--uncontested severance proceeding

 $225.00 plus approximately $10.00 publication cost.

* Bankruptcy--non-business, no contested proceedings

 Individual
 $250.00 plus $55.00 court filing fee

 Wife and Husband
 $300.00 plus $110.00 court filing fee

* Change of Name

 $95.00 plus $20.00 court filing fee

Information regarding other types of cases furnished on request

### Legal Clinic of Bates & O'Steen
617 North 3rd Street
Phoenix, Arizona 85004
Telephone [602] 252-8888

GORDON, Justice (specially concurring):

I concur in the result. While I agree with much of the law and many of the comments expressed by the majority, I feel compelled to add a few comments of my own.

The content of the advertisement in this case highlights the concern expressed by Chief Justice Burger in his concurring opinion in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L. Ed.2d 346 (1976):

"* * * [T]he advertisement of professional services carries with it quite different risks than the advertisement of standard products.

\* \* \* \* \* \*

"I doubt that we know enough about evaluating the quality of medical and legal services to know which claims of superiority are 'misleading' and which are justifiable. Nor am I sure that even advertising the price of certain professional services is not inherently misleading, since what the professional must do will vary greatly in individual cases. It is important to note that the Court wisely leaves these issues to another day." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, at 774, 96 S.Ct. at 1832.

Few members of the Bar, much less the public at large, would similarly define or explain what services were included in handling a "simple" or "uncontested" divorce. Moreover, I am able to foresee instances in which the $175.00 fee quoted for this service would be unreasonably high. Is it deceptive to advertise legal services in connection with an uncontested adoption proceeding when by statute the county attorney, upon application, is required to perform similar services without expense to the petitioner? A.R.S. § 8-127.

These and other difficulties demonstrate some of the substantial policy considerations which justify restrictions on advertising by

attorneys. Whether a blanket ban on certain forms of advertising is unconstitutional as violative of the First Amendment is a far weightier question which I am not yet prepared to resolve in the negative. I am concerned, however, that to impulsively discard the regulations leaving few if any guidelines in their wake, might well initiate a flood of media combat for legal business which would serve neither the best interests of the public nor the Bar.

HAYS, Justice (dissenting).

I dissent. I agree with the opinion of the majority in all respects except that I cannot go along with the punishment imposed. It appears to me that the "watered down" version of punishment adopted by the majority invites more and better testing of all the provisions of the Code of Professional Ethics. Admittedly, the Respondents violated the Code in order to secure more clients for their legal clinic. The testing of an allegedly questionable provision was incidental and the method of testing was the one calculated to attain the monetary advantage sought.

I would adopt the penalty recommended by the Special Administrative Committee, suspension for not less than six (6) months.

HOLOHAN, Justice (dissenting).

The matters presented by this case involve important issues of constitutional law and public policy. Recent decisions of the Federal Supreme Court have brought into question activities which were once assumed lawful in the regulation of professional conduct of attorneys. Assumptions of the past must be reexamined in light of the continual development of First Amendment rights. Despite my own personal dislike of the concept of advertising by attorneys, I have concluded that the advertising ban contained in DR 2–101(B) of the Disciplinary Rules is unconstitutional.

There is an additional consideration present in this case which, aside from the constitutional issues, suggests that we should not enforce the ban on advertising when it deals with the fees to be charged for services. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the United States Supreme Court held that minimum fee schedules for attorneys is price fixing forbidden by the Sherman Act. The ban on advertising by attorneys is also under attack as a method of price fixing which is equally unlawful under the Sherman Act. The majority opinion does not contend that the absolute ban on advertising by attorneys is not a violation of the Sherman Act. This Court is content to rely on the position that the ban is exempt from the Sherman Act as state action, citing *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Since the ban on advertising by attorneys was enacted by this Court under the authority of the State Constitution, the time has arrived for us to review that ban in light of the fact that such action is in fact contrary to the national public policy. It may be that we have the power to exempt attorneys from the Sherman Act, but should we continue such a position in the face of national public policy to the contrary?

While this Court may enact an exemption from the Sherman Act, it may not limit the rights of persons under the First Amendment. What is at stake in this case is more than regulation of a profession or the discipline of two lawyers. More fundamentally there is involved the right of the public as consumers and citizens to know about the activities of the legal profession. Obviously the information of what lawyers charge is important for private economic decisions by those in need of legal services. Such information is also helpful, perhaps indispensable, to the formation of an intelligent opinion by the public on how well the legal system is working and whether it should be regulated or even altered. This Court's power to

regulate the profession of law comes from the people, and what the people give they can also take away. The rule at issue prevents access to such information by the public.

In May of this year, the United States Supreme Court struck down a ban on advertising of prices by pharmacies in the State of Virginia. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The case held that "commercial speech" (advertising) is entitled to First Amendment protection. Society and consumers were held to have strong interest in the free flow of commercial information.

The majority opinion correctly points out that the U.S. Supreme Court reserved judgment on whether a ban on commercial advertising might be constitutional, stating:

> "We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." 425 U.S. 748, 96 S.Ct. 1817, 48 L.E.2d 346.

While the majority concludes that this statement supports a complete ban of advertising by attorneys, I am not inclined to such a conclusion. Certain kinds of advertising by lawyers may cause confusion and deception, but the remedy is to ban such kinds of advertising rather than any form of advertising. This appears to me to be what the Court meant in *Va. Pharmacy Bd.* when it stated: "In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it

can never be regulated in any way." Slip Op. p. 22. Similarly, the Court noted: "Untruthful speech, commercial or otherwise, has never been protected for its own sake." Slip Op. p. 23.

Disciplinary Rule 2–101(B) purports to ban advertising by attorneys, but in reality the rule discriminates between one type of commercial advertising and another type which is permitted by Disciplinary Rule 2–102(A)(6).

> "(A) A lawyer or law firm shall not use professional cards, professional announcement cards, office signs, letterheads, telephone directory listings, law lists, legal directory listings, or similar professional notices or devices, except that the following may be used if they are in dignified form:
>
> .  .  .  .  .  .
>
> "(6) A listing in a reputable law list or legal directory giving brief biographical and other informative data. A law list or directory is not reputable if its management or contents are likely to be misleading or injurious to the public or to the profession. A law list is conclusively established to be reputable if it is certified by the American Bar Association as being in compliance with its rules and standards. The published data may include only the following: name, including name of law firm and names of professional associates; addresses and telephone numbers; one or more fields of law in which the lawyer or law firm concentrates; a statement that practice is limited to one or more fields of law; a statement that the lawyer or law firm specializes in a particular field of law or law practice but only if authorized under DR 2–105(A)(4); date and place of birth; date and place of admission to the bar of state and federal courts; schools attended, with dates of graduation, degrees, and other scholastic distinctions; public or quasi-public offices; military service; posts

of honor; legal authorships; legal teaching positions; memberships, offices, committee assignments, and section memberships in bar associations; memberships and offices in legal fraternities and legal societies; technical and professional associations and societies, foreign language ability; names and addresses of references, and, with their consent, names of clients regularly represented."

By whatever name described the "reputable law list" is advertising. It strains reason to contend that listing a law firm's clients is not a method of publicizing the success and expertise of the members of the firm in serving clients, especially well-known corporate enterprises. The discrimination between other commercial media and reputable law lists has no rational basis. It is true that law lists are generally directories furnished to subscribers who are lawyers and other special groups. The record in this case notes that some law lists appear in public libraries. If the information in such directories is not misleading or injurious to the public or to the profession, there appears to be no justifiable reason why such material cannot also be used in the commercial media generally.

In summary, the ban on advertising by attorneys contained in DR 2–101(B) is contrary to national policy, is a denial of First Amendment rights, and violates the equal protection provision of the Fourteenth Amendment. This Court should forthrightly declare the rule unconstitutional. We can then attempt to write rules which provide for public access to information about attorneys. It may be that the information currently permitted to be published in "reputable law lists" is also suitable for the members of the public. In any event what we have now is defective. We need to create new guidelines which allow for broader dissemination of information to the public but at the same time protect them from misleading or deceptive statements.